UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO. _____ |
| | ) | |
| CENTENNIAL ELEMENTARY | ) | |
| SCHOOL PTA, INC. and | ) | |
| GAINESVILLE CITY SCHOOL SYSTEM, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, Cincinnati Insurance Company ("Plaintiff") and, for its Complaint against Defendants Centennial Elementary School PTA, Inc. and the Gainesville City School System, shows this Court the following:

## JURISDICTION AND VENUE

1.     Plaintiff is a corporation chartered under the laws of the State of Ohio with its principal place of business in Fairfield, Ohio and authorized to transact business in the State of Georgia.

2.     Centennial Elementary School PTA, Inc. (the "PTA") is a corporation organized and existing under the laws of the State of Georgia and may be served

with process by serving its registered agent, Georgia Congress Of Parents And Teachers, Inc., at 114 Baker Street NE, Atlanta, Fulton County, Georgia 30308 or through its attorney, Craig R. White at 1505 Crown Pointe Parkway, Suite 710, Atlanta, DeKalb County, Georgia 30338. The PTA maintains its registered office and principal place of business in Georgia. The PTA maintains its registered office in Fulton County which is embraced by this Court and this Division. The PTA is subject to jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1332.

3.     Defendant Gainesville City School System (the "School System") is a charter school system that operates several charter schools in the City of Gainesville, Hall County, Georgia and may be served with process by serving its superintendent, Dr. Wanda Creel, 580 Oak Street, Gainesville, Hall County, Georgia 30501. The School System is a political subdivision of the State of Georgia that may sue and be sued. The School System is subject to jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1332.

4.     The amount in controversy in this action exceeds $75,000.00 as required by 28 U.S.C. § 1332. This Court has supplemental jurisdiction over Georgia state law claims.

5.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to the action occurred in the Northern District of Georgia.  *See* 28 U.S.C. § 1391(b).

6.      Venue is properly within this district pursuant to 28 U.S.C. § 1391(b)(1) because all defendants are citizens of the State of Georgia, with the PTA residing in this judicial district and division.

## GENERAL BACKGROUND FACTS

7.      The PTA is and was at all times relevant to this Complaint, the official parent teacher association for Centennial Arts Academy (the "School"), a charter elementary school operated by the School System.

8.      On May 19, 2011, Booster, Inc. ("Booster") and the School and PTA entered into that certain Boosterthon Fun Run Contract (the "Contract"). Attached as **Exhibit 1** is a true and correct copy of the Contract.

9.      Angela H. Brand ("Brand") and Misty Clayton ("Clayton") (collectively, Brand and Clayton are referred to herein as the "PTA Signers") executed the Contract on behalf of the PTA in their official capacities as President and President Pro-Tem of the PTA.

10.     Under the terms of the Contract, Booster was to provide its services in assisting the School and PTA with the pre-event coordinating and the operation of the fundraising "fun run" (the "Fun Run").

11.     On February 2, 2012 the Fun Run was held at the School with the PTA providing volunteers to manage the Fun Run.

12.     During the Fun Run, Deborah Taylor ("D. Taylor") was injured resulting in significant and permanent medical conditions requiring life-long treatment ("Taylor Injury").

13.     Defendants are contributorily liable for the Taylor Injury.

14.     As a result of the Taylor Injury, Taylor and her husband Brian Taylor ("B. Taylor") (collectively, D. Taylor and B. Taylor are referred to herein as the "Taylors") filed a legal action in the State Court of Fulton County, Georgia under case number 13EV017398 against Booster for negligence resulting in the Taylor Injury (the "Lawsuit"). A true and correct copy of the Complaint filed by Taylor in the Lawsuit is attached hereto as **Exhibit 2**.

15.     Plaintiff issued one or more insurance policy(ies) in favor of Booster under which Plaintiff was required to pay the costs of defending and/or resolving the Lawsuit.

16.   On or about June 14, 2015, the Taylors, Booster, and Plaintiff executed that certain Release and Confidentiality Agreement resolving the Lawsuit and all claims related to the Taylor Injury without acknowledging or otherwise admitting any liability for the Taylor Injury (the "Settlement Agreement").

17.   Under the terms of the Settlement Agreement, Plaintiff compensated the Taylors so as to resolve the Lawsuit and all claims related to the Taylor Injury (the "Settlement Costs").

18.   On October 22, 2015, Plaintiff sent via certified mail ante litem notice of its claim against the School System to the School System, pursuant to O.C.G.A. § 36-33-5, et seq. ("Ante-Litem Notice"). A true and correct copy of the Ante-Litem Notice is attached hereto as **Exhibit 3**.

19.   As a result of Plaintiff incurring the Settlement Costs, Plaintiff is Booster's subrogee for the purposes of recovering the Settlement Costs from Defendants as Booster's indemnifiers.

### COUNT I
**Indemnification**

20.   The allegations of paragraphs 1 through 19 of this Complaint are incorporated herein by this reference as if set forth fully herein.

21.   Plaintiff herein denies any liability in connection with the Taylor Injury; however, regardless of such liability Plaintiff is entitled to indemnity from

5

Defendants for the Settlement Costs incurred in resolving claims against its insured.

22.    Pursuant to the Contract, Defendants had a clear legal duty to indemnify, defend, and hold harmless Booster from any and all claims related to the Fun Run other than those caused solely by Booster's own gross negligence or willful misconduct, including the Taylor Injury, and all such costs or settlements arising therefrom.

23.    Defendants have failed to provide any form of indemnification to Booster or Plaintiff despite such duty.

24.    Plaintiff is Booster's subrogee for all costs incurred related to the Contract, the Fun Run, the Taylor Injury, defending the Lawsuit, and the Settlement Costs.

25.    Plaintiff is entitled to damages from Defendants for their failure to indemnify, defend, and hold harmless Booster in an amount to be determined at trial, plus interest, in the principal amount of at least $1,000,000.00, plus the costs of this action, and attorneys' fees.

26.    Defendants have been stubbornly litigious and has caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action thereby

entitling Plaintiff to recover attorneys' fees and expenses of litigation against Defendants, pursuant to O.C.G.A. § 13-6-11.

## COUNT II
### Breach of Contract

27.   The allegations of paragraphs 1 through 26 of this Complaint are incorporated herein by this reference as if set forth fully herein.

28.   Defendants breached their obligations under the Contract to Plaintiff to indemnify Booster or Plaintiff for all expenses, losses, costs and settlements arising out of the Lawsuit.

29.   Defendants also breached their obligations to provide Booster with binding liability waivers and releases from each and every participant in, and attendee to, the Fun Run.

30.   As a direct and proximate result of the Defendants' breach of the Contract, Plaintiff is entitled to damages from Defendants in an amount to be determined at trial, plus interest, in the principal amount of at least $1,000,000.00, plus the costs of this action, and attorneys' fees.

31.   Defendants have been stubbornly litigious and has caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action thereby

entitling Plaintiff to recover attorneys' fees and expenses of litigation against Defendants, pursuant to O.C.G.A. § 13-6-11.

## COUNT III
### Contribution

32.    Plaintiff re-alleges and reincorporates the allegations contained in Paragraphs 1 through 31 as if the same were fully set forth herein.

33.    Defendants assisted with promoting, operating, and conducting the Fun Run at which the Taylor Injury occurred.

34.    Defendants are jointly responsible for costs associated with resolving claims related to the Taylor Injury but have incurred no such costs and have instead allowed Booster, through Plaintiff, to incur all costs associated therewith.

35.    As a result of the actions described herein, Plaintiff has unjustly incurred expenses on behalf of Booster beyond Booster's share of the alleged fault resulting in the Taylor Injury.

36.    Plaintiff is entitled to damages against Defendants for contribution towards the common alleged torts alleged in the Lawsuit.

37.    Plaintiff is entitled to damages from Defendants for contribution under O.C.G.A. § 51-12-32 in an amount to be determined at trial, plus interest, in the principal amount of at least $1,000,000.00, plus the costs of this action, and attorneys' fees.

38.     Defendants have been stubbornly litigious and has caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action thereby entitling Plaintiff to recover attorneys' fees and expenses of litigation against Defendants, pursuant to O.C.G.A. § 13-6-11.

## ALTERNATIVE COUNT IV
### Violation Of Agency Law
### (The PTA)

39.     Plaintiff re-alleges and reincorporates the allegations contained in Paragraphs 1 through 38 as if the same were fully set forth herein.

40.     Or, in the alternative, should the School not be subject to the Contract, the PTA Signers, on behalf of the PTA, held themselves out to be the agents of the School when, in fact, they possessed no agency authority.

41.     The PTA's conduct fell below the ordinary and normal requirements and limitations of O.C.G.A. § 10-6-50, *et seq*.

42.     There was no principal-agent relationship between the School and the PTA.

43.     The PTA Signers, acting in their capacity as officers of the PTA, violated Georgia agency law and exceeded agency authority when, without regard to their actual authority, they acted or purported to act as an agent of the School by signing the Contract.

44.     The PTA injured Plaintiff by (l) failing to obtain authorization from the School to negotiate with Booster and sign the Contract, (2) failing to obtain a written agreement of representation or authorization from the School; (3) signing the Contract without the School's knowledge, authorization, or consent; (4) holding itself out to be an agent of the School when, in fact, the PTA possessed no such agency authority; and (5) representing to Booster that the PTA represented the School or otherwise had authority to act on the School's behalf, when it did not and without discussing the Contract with the School or advising the School that the PTA was acting on the School's behalf.

45.     Plaintiff has suffered damages due to the PTA's actions in an amount to be determined at trial, plus interest, of the legal fees and settlement amount paid by Plaintiff in the Lawsuit, plus the costs of this action, and attorneys' fees.

46.     The PTA's actions, breaches, and violations were undertaken in bad faith or with conscious indifference to the consequences.

47.     The PTA's actions, breaches, and violations were undertaken in bad faith or with conscious indifference to the consequences.

48.     Accordingly, Plaintiff is entitled to recover punitive damages against the PTA in an amount to be determined by the enlightened conscience of the jury.

49.    The PTA has been stubbornly litigious and has caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action, thereby entitling Plaintiff to recover attorneys' fees and expenses of litigation against the PTA, pursuant to O.C.G.A. § 13-6-11.

## ALTERNATIVE COUNT V
### Negligent Misrepresentation
### (The PTA)

50.    Plaintiff re-alleges and reincorporates the allegations contained in Paragraphs 1 through 49 as if the same were fully set forth herein.

51.    Or, to the extent the PTA lacked the authority to bind the School and execute the Contract on behalf thereof, the PTA negligently provided false information to Booster.

52.    The PTA negligently represented to Booster that it held authority to negotiate and sign the Contract as the School's agent regardless of the truth of the representations and without verifying its authority to do so.

53.    The PTA knew Booster would reasonably rely upon said representations as an inducement to enter into the Contract.

54.    Booster relied upon the information contained in the PTA's above-referenced representations to Plaintiff's injury as Booster's subrogee.

55.    Plaintiff has suffered damages due to the PTA's negligent misrepresentations in an amount to be determined at trial, plus interest, in the amount of the legal fees and settlement amount paid by Plaintiff in the Lawsuit, plus the costs of this action, and attorneys' fees.

56.    The PTA's actions, breaches, and violations were undertaken in bad faith or with conscious indifference to the consequences.

57.    The PTA's actions, breaches, and violations were undertaken in bad faith or with conscious indifference to the consequences.

58.    Accordingly, Plaintiff is entitled to recover punitive damages against the PTA in an amount to be determined by the enlightened conscience of the jury.

59.    The PTA has been stubbornly litigious and has caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action, thereby entitling Plaintiff to recover attorneys' fees and expenses of litigation against the PTA, pursuant to O.C.G.A. § 13-6-11.

## <u>COUNT VI</u>
### Punitive Damages

60.    The allegations of paragraphs 1 through 59 of this Complaint are incorporated herein by this reference as if set forth fully herein

61.    The conduct of the PTA, as fully set forth herein, was culpable acts. Such conduct demonstrated a conscious indifference to the consequences and an

entire want of care as to the well-being of Plaintiff as Booster's subrogee and was of such willful and wanton character, and with such reckless indifference, as to amount to an intentional disregard for the interests, property, and welfare of Plaintiff as Booster's subrogee, so as to permit the imposition of punitive damages.

62.    The PTA has been stubbornly litigious and have caused Plaintiff unnecessary trouble and expense in bringing and maintaining this action, thereby entitling Plaintiff to recover attorneys' fees and expenses of litigation against the PTA, pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

(a)    On Counts I-III, as to all Defendants, jointly and severally, as follows:

(i)    for principal in the amount of no less than $1,000,000.00, plus interest, the costs of this action, and attorneys' fees, in an exact amount of damages to be proven at trial, and for post-judgment interest as provided by law;

(b)    On Counts IV-V, as to the PTA, as follows:

(i)    for the amount of the legal fees and settlement amount paid by Plaintiff in the Lawsuit, plus interest, the costs of this action, and attorneys' fees, in an exact amount of damages to be proven at trial, and for post-judgment interest as provided by law;

(c)     On Count VI, for punitive damages against the PTA, in an amount to be determined in the enlightened conscience of a jury;

(f)     On all Counts, that judgment be entered against Defendants, jointly and severally, for attorneys' fees pursuant to O.C.G.A. § 13-6-11 in an amount to be determined by the enlightened conscience of a jury;

(g)     for all costs of this action; and,

(h)     for all such other and further relief as is just and proper.

Respectfully submitted this 23rd day of January, 2018.

ROGERS LAW OFFICES

*/s/ Beth E. Rogers*

Beth E. Rogers
Georgia Bar No.612092
James F. F. Carroll
Georgia Bar No. 940350
100 Peachtree Street, Suite 1950
Atlanta, GA 30303
(770) 685-6320 phone
Fax: (678) 990-9959
brogers@berlawoffice.com
jcarroll@berlawoffice.com
*Attorneys for Plaintiff*
*Cincinnati Insurance Company*



## Boosterthon Fun Run Contract

### SERVICES AGREEMENT

THIS SERVICES AGREEMENT (this "**Agreement**") is made and entered into on this 19 day of May, 2011 (the "**Effective Date**"), by and between BOOSTER ENTERPRISES, INC., a Georgia Corporation ("**Booster**"), and Centennial Arts Academy, a Elementary School (the "**Client**") (Booster and the Client are referred to collectively herein as the "**Parties**" or individually as a "**Party**").

### RECITALS

**WHEREAS**, Booster is in the business of organizing, marketing, and leading fundraising campaigns whereby students of educational institutions raise funds to sponsor their participation in an exercise based event, such funds (net of compensation to Booster) to be used by such institutions for the furtherance of the purpose thereof (each a "**Boosterthon Fun Run**");

**WHEREAS**, the Client is interested in hosting a Boosterthon Fun Run, and Booster is willing to offer its services in connection therewith on the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the mutual covenants and conditions set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **Engagement.** The Client hereby engages Booster to organize, market and manage a Boosterthon Fun Run (the "**Services**"), and Booster hereby agrees to provide the Services for the benefit of the Client, all on the terms and subject to the conditions set forth herein.

2. **Obligations of Booster.** Booster shall conduct a Boosterthon Fun Run on behalf of the Client. The services and materials provided by Booster as part of the Boosterthon Fun Run shall include, but are not limited to, supplying all prizes, advertising, promotion, organization, and refreshments necessary or appropriate, in the sole discretion of Booster, to conduct a Boosterthon Fun Run in accordance with Booster's customary practices and customs.

3. **Obligations of the Client.** The Client shall make available to Booster, its personnel and agents, any and all school grounds and facilities, as specified on Exhibit A, as well as any and all Client students, faculty, and staff, as specified, on the dates and during the times as set forth in Exhibit A. The Client shall arrange for the Volunteers (as defined herein) to participate, at the direction of Booster and its representatives, in the Primary Collection (as defined herein) to be held on the date specified in Exhibit A.

Exhibit 1

4. **Booking Fee.** Within three (3) business days of the execution of this Agreement, the Client shall pay to Booster a booking fee of *two thousand dollars ($2,000)* (the "Booking Fee"). The Client agrees that except as set forth in Section 9, the Booking Fee is non-refundable, earned as of the date of the execution of this Agreement, and will not be returned to the Client under any circumstances. The Client agrees that the Booking Fee is independent of the Booster Share set forth in Section 7 of this Agreement, and that the Booking Fee is not deductible or otherwise taken into consideration when calculating the Booster Share.

5. **Date of the Boosterthon Fun Run.** The dates and times of the Boosterthon Fun Run shall take place on the schedule set forth in Exhibit A.

6. **Collection of Funds.** The collection of funds raised as a result of the Boosterthon Fun Run shall take place as follows:

   (a) The primary collection shall take place on the date and time specified on Exhibit A (the "Primary Collection"). The Client shall send collection reminders regarding the Primary Collection to students on at least two separate occasions prior to the Primary Collection.

   (b) In connection with the Primary Collection, the Client shall provide at least six (6) volunteers (the "Volunteers") to assist with the Primary Collection. The Volunteers (with the assistance of Booster representatives, if requested) shall tally all of the funds collected by each of the participating students and/or classrooms from their respective Boosterthon Fun Run sponsors (the "Collected Funds"). In the event a Booster representative is unable to attend the Primary Collection, the Volunteers shall be solely responsible for collecting and tallying the Collected Funds.

   (c) Prior to the Primary Collection, Booster representatives will meet with the Volunteers to train them on the use of the Booster online collection program.

   (d) After all Collected Funds have been satisfactorily accounted for by the Booster representatives and/or the Volunteers, the Collected Funds shall be immediately distributed according to Sections 4 and 7 of this Agreement.

   (e) After the Primary Collection, the Parties may organize one or more additional collection dates. In the event that the Parties agree to pursue additional collection dates, the Parties will agree on a mutually acceptable date to hold such collection. Any additional collections shall be conducted in the manner set forth in Section 6(a)-(d) above.

7. **Distribution of Raised Funds.** As compensation for the services provided in conducting the Boosterthon Fun Run, Booster shall retain from the Collected Funds, or the Client shall cause to be paid, as applicable, an amount equal to forty-eight percent (48%) of the Gross Revenues generated by the Boosterthon Fun Run (the "Booster Share"). Fifty-two percent (52%) of the Gross Revenues raised by the Boosterthon Fun Run shall be retained by the Client. For purposes of this Agreement, "Gross Revenues" shall mean all funds collected or otherwise received by Booster, the Client, the participants in the Boosterthon Fun Run, or any other student, parent or Client employee or representative in connection with the fundraising efforts that are the object and purpose of the Boosterthon Fun Run or otherwise related thereto.

8.  **The Client's Acknowledgments, Representations and Covenants.**

(a)     The Client shall not actively promote any other fundraiser, including any annual fund, from the date of the "Initial Teacher Meeting" (according to the date assigned to this meeting on Exhibit A) until the date of the Primary Collection.

(b)     The Client hereby acknowledges that the Boosterthon Fun Run involves strenuous physical activity and hereby agrees that it is the sole responsibility of the Client to determine the physical condition, health, and fitness of its students and other participants in the Boosterthon Fun Run and the safety and suitability of each student's and other participant's participation in the Boosterthon Fun Run. The Client further acknowledges and agrees that Booster has no, and will not at any time have any, independent knowledge of, and is not responsible for investigating or determining (and will take no measures to investigate or determine) the physical condition, health, and fitness of the Client's students and other participants in the Boosterthon Fun Run or the safety or suitability of any student's or other participant's participation in the Boosterthon Fun Run, and the Client takes full responsibility for assessing physical condition of its students and all Boosterthon Fun Run participants and for alerting such students, their guardians, and any other participants to the nature of the Boosterthon Fun Run and any appropriate safety precautions.

(c)     The Client shall obtain legally enforceable liability waivers and releases from each and every participant in, and attendee to, the Boosterthon Fun Run (or from a parent or guardian on behalf of the participant, if the participant is not of the age of majority under applicable law), either in the form provided by Booster (if any) or in another form as is approved in advance by Booster, (i) which approval may be withheld in Booster's sole discretion, (ii) which indemnifies and holds harmless Booster and its officers, directors, shareholders, employees, agents, representatives and contractors of and from any and all expenses, losses, costs, demands, settlements, claims, lawsuits liability and judgments incurred by Booster to any and all of the participants in the Boosterthon Fun Run or any other third party arising from any event, act, occurrence or omission during the Boosterthon Fun Run not caused solely by Booster's gross negligence or willful misconduct and (iii) which further consents to and authorizes Booster and their designees to utilize the photograph, picture, likeness and/or voice of any such participant in any documentary, promotion or marketing efforts of Booster without any compensation to such participant.

(d)     The Client is responsible for obtaining and maintaining through the Boosterthon Fun Run all necessary permits as may be required for such events.

9.  **Termination.**

(a)     This Agreement may be terminated by the Client for any reason at any time prior to the date of the Student Pep-Rally set forth on Exhibit A by written notification (including email) to Booster.

(b)     This Agreement may be terminated by Booster at any time, and for any (or no) reason by written notification (including email) to the Client. In the event of termination of this Agreement by Booster, the Booking Fee shall be returned to the Client within thirty (30) days. The refund of the Booking Fee shall be the sole and exclusive liability of Booster, and the sole

and exclusive remedy of the Client, with respect to termination of this Agreement pursuant to this Section 9(b).

(c)     The Parties acknowledge and agree that the termination of this Agreement, whether by the Client or by Booster, shall not affect the distribution of Gross Revenues as set forth in Section 7 whether such Gross Revenues are collected prior to or after the termination of this Agreement.

10. **Indemnification.**   The Client shall indemnify, defend and hold harmless Booster, its shareholders, directors, officers, employees, agents, contractors and any other personnel retained by Booster for any and all expenses, losses, costs, demands, settlements, claims, lawsuits, liability, and judgments which Booster may become liable to defend or pay in whole or in part as a direct or indirect result of (a) any action, inaction, or negligence of the Client, its agents, employees, students, and volunteers; (b) any condition or hazard located on or part of the site designated by the Client for the Boosterthon Fun Run; (c) any failure by the Client to obtain the liability waiver and release from any participant (or guardian thereof) as contemplated by Section 8(c); and (d) any event, act, occurrence or omission during the Boosterthon Fun Run or arising out of or related to the provision of the Services by Booster not caused solely by Booster's gross negligence or willful misconduct.  Booster shall indemnify and hold harmless the Client, its agents and employees for any and all expenses, losses, costs, demands, settlements, claims, lawsuits, liability, and judgments which the Client may become liable to defend or pay resulting from any event, act, occurrence or omission during the Boosterthon Fun Run or arising out of or related to the provision of the Services by Booster caused solely by Booster's gross negligence or willful misconduct.

11. **Assignment.**  The Client will not transfer, assign or encumber this Agreement without the prior written consent of Booster, and any such attempted assignment or encumbrance without such consent shall be null and void. Booster shall have the right to assign this Agreement in whole or in part to any of its affiliates without the consent of the Client.

12. **Audit Right.**

(a)     The Client shall keep, maintain and preserve in its principal place of business, during the term of this Agreement and for at least one (1) year following its termination or expiration, complete and accurate books, accounts, records and other materials covering all transactions (including all donations and Gross Revenues generated by the Boosterthon Fun Run) related to this Agreement.  Upon reasonable notice, Booster and/or its duly authorized representatives shall be given full access to, and shall have the right to inspect and audit, all such records and other materials related to this Agreement.  Such records and other materials shall be available for inspection and audit (including photocopying) during reasonable business hours at any time during the term of this Agreement and for at least one (1) year following its termination or expiration.   The Client will cooperate and will not cause or permit any interference with Booster and/or its representatives in the performance of their duties of inspection and audit.   Except as set forth in paragraph (b) below, any such audit shall be performed at Booster's sole expense.

(b)     Should an audit indicate an underpayment by the Client of any of the compensation to be paid to Booster hereunder, the Client shall be liable for the full amount of

any such underpayment, including interest at the highest rate allowable under applicable law. The Client shall submit any and all of the foregoing payments owed to Booster within thirty (30) days from the date of the conduct of the audit.

13. **Intellectual Property.**

(a)    The Client hereby acknowledges and agrees that Booster's trademarks, label designs, product and service identification, artwork and other symbols associated with Booster's Services ("**Booster Marks**") are and shall remain Booster's property.

(b)    The creative ideas, concepts (including the concept of the Boosterthon Fun Run as a fundraiser), slogans, art and printed material provided to the Client prior to the date hereof are the property of Booster and cannot be used, duplicated, copied or repeated without Booster's prior written consent.

(c)    The Client shall not manufacture or sell, or license or procure the manufacture or sale of, any tee-shirts or other promotional or other merchandise which bears the Booster Marks except as otherwise consented to by Booster in writing.

(d)    Booster shall own all right, title and interest in and to all intellectual property created by or on behalf of either Party in connection with this Agreement or the Boosterthon Fun Run, including, without limitation, all logos, names, ideas, concepts, creative materials, promotional materials, advertising, and graphics, including all copyrights and proprietary rights therein, and any inventions and discoveries first conceived or developed, whether or not protected by patent, trade secret or copyright. The distinctive colors, concepts, indicia and look displayed by Booster at the Boosterthon Fun Run and by Booster in its regular business operations and materials shall constitute Booster property and therefore be owned by Booster. The Client expressly acknowledges that the Parties have agreed that all copyrightable aspects of the Boosterthon Fun Run are to be considered "works made for hire" within the meaning of the Copyright Act of 1976, as amended (the "Act"), of which Booster is to be the "author" within the meaning of such Act. All such copyrightable works, as well as all copies of such works in whatever medium fixed or embodied, shall be owned exclusively by Booster as its creation, and the Client hereby expressly disclaims any interest in any of them. The Client expressly acknowledges that it is not a joint author and that all works created in connection with the Services hereunder are not joint works under the Act.

(e)    Any and all rights of Booster, including those in and to the Boosterthon Fun Run, are reserved to Booster and may be exercised, marketed, licensed, exploited or disposed of by Booster with respect to any third parties concurrently with the term of this Agreement.

14. **Notices.**  Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and (a) delivered personally, (b) transmitted by guaranteed overnight delivery services, or (c) sent by certified mail, return receipt request, postage prepaid, addressed as shown below, or to such other address as the party concerned may substitute by written notice to the other. All notices personally delivered or sent by overnight delivery service shall be deemed received on the date of delivery. All notices forwarded by mail shall be deemed received on the date of the return receipt.

Booster:     Booster Enterprises, Inc.
_____
_____
             Telephone: _____
             Attn: _____

Client:      Centennial Arts Academy
             852 Century Place
             Gainesville, GA 30501
             Telephone: 770-287-2044
             Attn: Natalie Kempker

15. **Choice of Law/Venue.** This Agreement will be construed and enforced according to the laws of the State of Georgia, United States of America, without giving effect to any conflicts of law rule or principle that might require the application of the laws of another jurisdiction. The Client agrees that any action or proceedings arising out of this Agreement shall be brought and maintained in Georgia, and hereby consents to the jurisdiction of courts located in Georgia. Service of process in any such action or proceeding shall be deemed sufficient if mailed, first class, postage prepaid, to Booster or the Client at the respective address set forth above.

16. **Relationship of Parties.** Booster is an independent contractor and nothing herein shall be construed to make either Party the partner, employee, joint venture or agent of the other Party. Except as set forth in this Agreement, neither Party shall have the right or power to obligate or bind the other in any manner whatsoever. Except as expressly set forth otherwise herein, the Client shall not exercise direct supervision or control over Booster's day-to-day activities or over Booster's employees, agents or subcontractors. Each of Booster and the Client shall be solely responsible for its actions and the actions of its employees and agents. For the avoidance of doubt, neither Booster nor its employees, agents or subcontractors, including, without limitation, any temporary labor, shall be deemed the Client's employees, agents or subcontractors, and no such party or individual shall hold itself out as such. In no event shall the Client be responsible for providing any employee benefits to any such party or individual. Without limiting the generality of the foregoing, (a) the Client shall not withhold from any of the consideration hereunder, except when required by law, any amount for federal income taxes, social security, Medicare or any other legal deductions; and (b) the Client shall not make premium payments or contributions for any workers' compensation or unemployment compensation benefits for any employee or agent of Booster or its agents, payment of which shall be Booster's responsibility.

17. **Unavoidable Delay.** The Parties shall not be liable for failure to perform its complete obligations described in this Agreement, if such failure results from any act of God, inclement or severe weather, flood, earthquake, terrorist attack, riot, war, civil unrest or other cause outside of a Party's control that prevents such Party from fulfilling its obligation as outlined in this agreement (a "**Force Majeure Event**"). If a Boosterthon Fun Run is not staged due to a Force Majeure Event, Booster shall be permitted to keep the Booking Fee for the Boosterthon Fun Run, and no Party shall have further recourse against the other Party for fees or services with respect to such cancelled event. In the event that the Boosterthon Fun Run is cancelled due to a Force Majeure Event, Booster will work with the Client to schedule an alternative date for the Boosterthon Fun Run at a date that is mutually convenient for the Parties. 

18. **Further Assurances.** The parties agree to take such action, and to produce or execute such other documents or agreements as may be necessary or desirable for the execution and implementation of this Agreement and the consummation of the transactions contemplated hereby.

19. **Jury Trial Waiver.** BOOSTER AND THE CLIENT HEREBY WAIVE ANY AND ALL RIGHT TO ANY TRIAL BY JURY IN THE EVENT ANY DISPUTE, ACTION, DISAGREEMENT, DIFFERENCE, CONTROVERSY, CLAIM OR PROCEEDING (EACH, A "CLAIM") ARISES CONCERNING THIS AGREEMENT AND/OR THE BOOSTERTHON FUN RUN. Any Claim arising out of or relating to this Agreement or the breach thereof shall be submitted to a meeting of the Parties. Representatives of the Parties shall meet within ten (10) days after one Party submits a notice to the other Party requesting such meeting. If the Claim is not settled within ten (10) days after the date of the aforesaid notice, any Party may cause the Claim to be submitted to and be determined by binding arbitration to be administered in accordance with the by the American Arbitration Association's ("AAA") commercial rules and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitration shall be held in Atlanta, Georgia, and conducted before a panel of three (3) neutral arbitrators selected from a panel supplied to the Parties by the AAA. The arbitration proceedings shall be conducted using the expedited procedures of the AAA.

20. **Severability.** If any provision of this Agreement, or part thereof, or the application of any provision, or part thereof, to any person, entity, or circumstance, is held invalid or unenforceable, the application of such provision, or part thereof, other than to the extent it is held invalid or unenforceable, shall remain in full force and effect. All other provisions in this Agreement shall remain in full force and effect.

21. **Entire Agreement/Amendment.** This Agreement, together with Exhibit A, constitutes the final, complete, and exclusive embodiment of the entire agreement and understanding between Booster and the Client and supersedes and preempts any prior or contemporaneous understandings, agreements, or representations by or between the parties, whether written or oral. Any amendment to this Agreement shall be set forth in writing, dated, and signed by both parties to this Agreement.

22. **Counterparts.** This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement. Documents, including signatures, transmitted via facsimile or electronic transmission shall have the full force and effect of original documents.

(signatures on the following page)

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered effective on the date first above written.

"Booster"

BOOSTER ENTERPRISES, INC.

By: _____

Name: _____

Title: _____

"Client"

Name of Client: Centennial Arts Academy

By: _____

Name: Angela H. Brand (Angie)

Title: President

By: _____

Name: Misty Clayton

Title: President pro tem

Exhibit A

Boosterthon Fun Run Schedule

| Event | Date(s) | Parties Involved |
|---|---|---|
| Initial Teacher Meeting | Jan. 24, 2012 | |
| Student Pep-Rally | Jan. 25, 2012 | |
| Team Day 1 | Jan. 26, 2012 | |
| Team Day 2 | Jan. 27, 2012 | |
| Team Day 3 | Jan. 30, 2012 | |
| Team Day 4 | Jan. 31, 2012 | |
| Team Day 5 | Feb. 1, 2012 | |
| Team Day 6 | Feb. 2, 2012 | |
| Boosterthon Fun Run Event | Feb. 2, 2012 | |
| Primary Collection | Feb. 17, 2012 | |



WE LOOK FORWARD TO *Boosterthon* FUN RUN FITNESS ○ LEADERSHIP ○ CHARACTER SERVING YOUR SCHOOL!

WIN *Create a remarkable experience for all*        FM 3.0

FUN RUN

# FUN RUN SET UP
## 1 Tunnel Run



Note: Be aware of your electricity, flow of students from the school and where to point the speakers. (Be aware of neighborhoods.)

## ★ EXPECTED

- 3 Tents/4 Flags inside every track
- 110ft long. 20ft wide. 30ft start line.(65 total. 30 ft each leaving 5 ft for the stand.)
- 2 people required when setting up tents
- Stake in every corner of the tent and every flag stand
- Boosterthon Music ONLY
- Sunglasses are NOT allowed at the run. Emotional connections are made through eye contact.
- Personally thank every parent that comes to the run. (Divide up. 1 team member per track.)
- Make sure the generator is hidden and sound is muffled away from the crowd.

102



# FUN RUN SET UP
## 2 Tunnel Run



## ★ EXPECTED

- 3 Tents/4 Flags inside every track
- 110ft long. 20ft wide. 30ft start line.(65 total. 30ft each leaving 5ft for the stand)
- 2 people required when setting up tents
- Stake in every corner of the tent and every flag stand
- Boosterthon Music ONLY
- Sunglasses are NOT allowed at the run. Emotional connections are made through eye contact.
- Personally thank every parent that comes to the run. (Divide up. 1 team member per track.)
- Make sure the generator is hidden and sound is muffled away from the crowd.

103



WIN *Create a remarkable experience for all*   FM 3.0

FUN RUN

# FUN RUN SET UP
### Indoor Run



- Always allow enough space for the # of students. Safety is the # 1 priority!
- If you have a stage in the gym, feel free to put the DJ on the stage.
- If you have a larger gym, feel free to put more tents in the middle.
- Adjust the size of the track and length of the soundtrack based on the size of gym, # of students, etc.
- Utilize and use as many flags as possible.
- Keep water out of the gym. (The floor will get slippery)
- Most (not all) indoor runs will be around 15 minutes and will have to split boys/girls per grade. One will cheer while the other runs. After 15 minutes, they switch.

## ★ EXPECTED

- 2 people required when setting up tents
- Make sure the start/finish line is pretty sizable and flows well.
- Boosterthon Music ONLY
- Sunglasses are NOT allowed at the run. Emotional connections are made through eye contact.
- Personally thank every parent that comes to the run. (Divide up. 1 team member per track.)

State Court of Fulton County
***EFILED***
File & ServeXpress
Transaction ID: 52469733
Date: May 24 2013 04:40PM
Cicely Barber, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **DEBORAH TAYLOR and**<br>**BRIAN MARK TAYLOR,** | |
| **Plaintiffs,** | |
| | **JURY TRIAL DEMANDED** |
| **v.** | |
| | **CIVIL ACTION** |
| **BOOSTER ENTERPRISES, INC.,** | **FILE NO. _____** |
| **Defendant.** | |

### COMPLAINT FOR DAMAGES

COME NOW Deborah Taylor and Brian Mark Taylor, Plaintiffs in this action, and file this Complaint for Damages against Defendant as follows:

1.

Defendant Booster Enterprises, Inc. is a Georgia corporation, maintains its principle place of business in Fulton County, Georgia, is subject to the jurisdiction of this Court, venue is proper, and it may be served with Summons and Complaint as allowed by law.

2.

Plaintiffs are residents of Gainesville, Hall County, Georgia and have been married as husband and wife at all times relevant to this action.

### FACTS

3.

On February 2, 2012, Defendant conducted a Boosterthon Fun Run fundraising activity at Centennial Arts Academy elementary school ("the event") in Gainesville, Georgia.

**Exhibit 2**

4.

Defendant was responsible for the organization of the event, including the management of the running portion of the event during which elementary school children enrolled at Centennial Arts Academy were to run around a "track" created by Defendant in order to raise money from donors who had pledged a certain amount for each lap run by the children.  This running activity will be referred to herein as the "fun run."

5.

For some period of time, believed to be ten days, preceding the fun run, Defendant's employees were at Centennial Arts Academy and worked with the children to excite them to get donors and to look forward to the fun run.

6.

The initial plan was for the fun run to be conducted on an approximately 1/16 mile track created by Defendant outdoors.

7.

On the date of the event, it rained and the fun run portion of the event was moved indoors where Defendant created a track for the children to lap.

8.

The fun run was divided into grade level groups with entire grades running en mass.

9.

Defendant was responsible to insure that the running of the laps was conducted safely and consistent with reasonable standards of care relating to crowd control, safety, and event security.

10.

It was foreseeable to Defendant that if the run was not conducted properly, children and others involved in helping the children, would be injured by being trampled, run over, and knocked down.

11.

Defendant knew or should have known that the children would consider the running portion of the event a competitive exercise, would run with a certain degree of abandon, and thus the issue of time had to be properly managed to prevent injuries.

12.

Despite the fact that Defendant knew or should have known that the children would consider the fun run a competitive exercise, Defendant played loud music, worked up the children and generally created an environment in which children would be trying to accomplish their lap goals in minimal time.

13.

Defendant knew or should have known that the space for the children to run the laps was inadequate given the number of children, the speed at which they were expected to run, the disparate sizes and abilities of the children, and the creation of bottlenecks throughout the confines of the indoor location, at a tunnel and at the lap counters.  These conditions prevented the children from spreading out and instead kept them bunched up so that faster and larger children were running with slower and smaller children.

14.

Defendant knew or should have known that the children believed that they had to complete the laps in a certain amount of time or they would not be able to collect the full amount of pledges acquired.  Defendant had spent the

days preceding the fun run exciting the children to run fast to earn as much money as possible.

15.

Defendant knew or should have known that the information provided to the children would cause them to run too fast given the confined space, the bottlenecks, and the vastly differing skills and sizes of their classmates.

16.

Defendant created a high-energy environment with loud music and cheerleading by Defendant's employees, which Defendant knew or should have known would create a scenario where children would fall down, be pushed down, and would need to be pulled to safety off the track to avoid injury.

17.

Despite Defendant's knowledge of the potential for injury to students, and adults who rendered aid to them, Defendant did not comply with reasonable and appropriate standards for crowd control during the fun run.

18.

Plaintiff Deborah Taylor was a staff member of Centennial Arts Academy. It was not her profession or job to rescue children who fall during running events like the one conducted by Defendant.

19.

Defendant was aware that people like Plaintiff Deborah Taylor would attempt to rescue a fallen child during the running portion of the event to prevent the child from being trampled by the pack or crowd of children running laps during the fun run.

20.

Plaintiff Deborah Taylor did attempt to rescue a fallen child in order to protect the child from injury by being trampled or otherwise tripped over, as well as to protect others who might fall on the child.

21.

In the process of rescuing a fallen child, Plaintiff Deborah Taylor was run over by a mass of children on the track and suffered serious injuries as a result.

COUNT ONE

(Negligence)

22.

Plaintiffs repeat, reallege, and incorporate by reference, the allegations of Paragraphs 1 through 21 of this Complaint as if repeated herein as Paragraph 22.

23.

In creating a crowd of children who were running in an uncontrolled manner, so that children were falling and needing to be rescued to protect them from injury, Defendants failed to exercise the degree of care a reasonable company in the same or similar circumstances would have exercised. Defendants were negligent in at least the following particulars:

(a)     creating a situation where participants in the fun run felt that time constraints required them to run as fast as they could;

(b)     creating a situation where participants in the fun run did not have adequate space to run safely without creating a risk of injury caused by large groups of children who were bunched together;

(c)     failing to provide information to the children to keep them controlled and minimize the possibility of injury;

(d)     creating a high-energy environment where participants in the fun run were falling down, being pushed down, and needed to be rescued in order to protect them from foreseeable injury.

As a direct and proximate result of the negligence of Defendant, Plaintiff Deborah Taylor suffered severe and permanent bodily injuries including serious and permanent physical and emotional injury and disability, disfigurement, substantial and continuing pain, suffering, and discomfort, medical expenses both past and future, and lost wages both past and future.

24.

In the future, Plaintiff Deborah Taylor will suffer additional permanent pain, suffering and discomfort caused by Complex Regional Pain Syndrome and/or Reflex Sympathetic Dystrophy, disfigurement and disability secondary to the likelihood of having her leg amputated, along with additional and significant medical expenses and lost wages, all of which are the result of Defendant's negligent conduct.

25.

As a direct and proximate result of Defendant's negligent conduct, Plaintiff Deborah Taylor is entitled to an award of special damages against the Defendant for past and future medical expenses and lost wages in an amount to be shown at trial, and general damages in an amount to be determined by the enlightened conscience of a jury of her peers, all in excess of One Million Dollars.

COUNT TWO

(Loss of Consortium)

26.

Plaintiffs repeat, reallege, and incorporate by reference, the allegations of Paragraphs 1 through 25 of this Complaint as if repeated herein as Paragraph 26.

27.

At all times relevant to this action, Plaintiff Brian Mark Taylor has been the husband of Plaintiff Deborah Taylor.

28.

As a direct and proximate result of the negligence of the Defendant, Plaintiff Deborah Taylor suffered severe and permanent bodily injuries including serious and potentially permanent physical injury and disability, substantial and continuing pain, suffering, and discomfort, disfigurement, and medical expenses and wage losses, both past and future.  As a result of these injuries, her husband, Plaintiff Brian Mark Taylor, has lost the domestic and conjugal services previously provided to him by his wife and has been deprived of his right to consortium.

29.

As a direct and proximate result of Defendant's negligence, Plaintiff Brian Mark Taylor is entitled to an award of general damages against the Defendant for his loss of consortium in an amount to be determined by the enlightened conscience of a jury of his peers in an amount in excess of Five Hundred Thousand Dollars ($500,000.00).

WHEREFORE, Plaintiffs pray FOR A TRIAL BY JURY, that summons issue, that judgment be entered in their favor and against the Defendant, and that the following relief be granted:

(a) Under Count One, that Plaintiff Deborah Taylor be awarded against the Defendant, her special damages in the amount proved at trial, and that she be awarded general damages in an amount to be determined by the enlightened conscience of a jury of her peers, all in excess of One Million Dollars ($1,000,000.00);

(b) Under Count Two, that Plaintiff Mark Taylor be awarded against the Defendant, his general damages in an amount to be determined by the enlightened conscience of a jury of his peers, in an amount in excess of Five Hundred Thousand Dollars ($500,000.00);

(c) That the cost of this action be levied against Defendant; and

(d) That Plaintiffs be awarded such other and further relief as the Court deems just and proper.

This 24th day of May, 2013.

Respectfully submitted,

WARSHAUER LAW GROUP, P.C.

**By:** /s/ Michael J. Warshauer

Michael J. Warshauer
Georgia State Bar Number 018720
Darl H. Champion, Jr.
Georgia State Bar Number 910007

3350 Riverwood Parkway,
Suite 2000
Atlanta, GA 30339
Tele: (404) 892-4900
Fax: (404) 892-1020
mjw@warlawgroup.com
dhc@warlawgroup.com

# GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, L.L.P.

1700 Atlanta Plaza
950 East Paces Ferry Road
Atlanta, Georgia 30326
(404) 870-7387 (Telephone)
(404) 870-7374 (Facsimile)
jbrieske@grsmb.com (Email)

October 22, 2015

**SENT VIA CERTIFIED MAIL**
**7013 0600 0000 6335 0217**
**City of Gainesville, Georgia**
Mr. Danny Dunagan, *Mayor*
City Administration Building
300 Henry Ward Way
Suite 303
Gainesville, GA 30501

**SENT VIA CERTIFIED MAIL**
**7013 0600 0000 6335 0255**
**City of Gainesville, Georgia**
James Palmour, III, *City Attorney*
City Administration Building
300 Henry Ward Way
Suite 306
Gainesville, GA 30501

**SENT VIA CERTIFIED MAIL**
**7013 0600 0000 6335 0224**
**Gainesville City School System**
Dr. Wanda Creel, Superintendent
c/o Gainesville City School System Board of
Education
508 Oak Street
Gainesville, GA 30501

**Courtesy Copy Provided To:**
**Gainesville City School System**
Phillip L. Hartley, *Counsel for Gainesville City
School System*
HARBEN HARTLEY & HAWKINS, LLP
340 Jesse Jewell Parkway
Suite 750
Gainesville, GA 30501

RE:  ***Ante Litem Notice pursuant to O.C.G.A. § 33-36-5 et. seq. and Initial Demand***
  Our Clients:  *Cincinnati Insurance Company*
  Date of Loss:  February 2, 2012
  Date of Settlement:  June 14, 2015

To Whom It May Concern:

  The purpose of this letter is to provide you with formal notice, pursuant to O.C.G.A. §
36-33-5; *see also* O.C.G.A. § 36-33-1 *et. al.*, that a claim for contribution will be instituted by or
on behalf of Cincinnati Insurance Company against the Gainesville City School System as a
result of a confidential settlement agreement entered between Cincinnati Insurance Company,
Booster Enterprises, Inc, and Deborah Taylor and Brian Mark Taylor, entered on June 14, 2015,
which resulted from an injury to Deborah Taylor which occurred during a "Boosterthon Fun
Run" held by Centennial Arts Academy on January 20, 2012. Specifically, Cincinnati Insurance
Company intends to file suit against Gainesville City School System for contribution of all sums

Exhibit 3

October 22, 2015
Anti Litem Notice and Demand
Claimant: Cincinnati Insurance Company
Page 2 of 2

paid by Cincinnati Insurance Company under the above-referenced confidential settlement agreement, entered June 14, 2014, arising from the Gainesville City School System's and Centennial Arts Academy's negligent supervision of its fundraising event, as well as contractual claims for indemnification.

This notice is being sent within six (6) months of the date in which Cincinnati Insurance Company's right of contribution arose, as required by O.C.G.A. § 36-33-5 *et seq.* However, in accordance with O.C.G.A. §§ 36-33-5 *et. seq.,* we will refrain from taking action on this claim for contribution for sixty (60) days following your receipt of this notice, or until the Gainesville City School System denies Cincinnati Insurance Company's claim for contribution, whichever occurs first.

If you wish to discuss this matter, please contact me at the above-listed contact information.

Sincerely,

James T. Brieske, Esq.
*Attorney for Cincinnati Insurance Company*