IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CINCINNATI INSURANCE COMPANY,

    Plaintiff,

               v.

CENTENNIAL ELEMENTARY SCHOOL
PTA, INC. and GAINESVILLE CITY SCHOOL
DISTRICT,

    Defendants.

Civil Action No.
1:18-cv-00334-SDG

## ORDER

This matter is before the Court on Defendant Gainesville City School District's ("District") motion for summary judgment [ECF 58] and Defendant Centennial Elementary School PTA, Inc.'s ("PTA") motion for summary judgment [ECF 59]. For the following reasons, the District's motion is **GRANTED** and the PTA's motion is **GRANTED IN PART and DENIED IN PART**.

## I.   BACKGROUND

Unless otherwise noted, the following facts are not disputed by the parties or are supported by undisputed evidence in the record. On May 19, 2011, Booster Enterprises, Inc. entered into an agreement with "Centennial Arts Academy, a[n] elementary school" ("Centennial Arts Academy" or "School") entitled the

"Boosterthon Fun Run Contract" ("Contract" or "Boosterthon Contract").[1] Neither the District nor the PTA are named parties to the Contract.[2] The Contract was signed by Chris Carneal (as "president") on behalf of Booster and Angela Brand and Misty Clayton (as "president" and "president pro-tem," respectively) on behalf of Centennial Arts Academy.[3] Neither Brand nor Clayton were employed by the School or District.[4] Rather, both served as officers of the PTA.[5] Both Brand and Clayton testified that they were instructed to sign the Contract by Charlene Williams, the School's principal.[6]

Throughout the Contract, Centennial Arts Academy is listed and referred to as the "Client."[7] The School, however, is not a legal entity and cannot execute contracts on its own behalf.[8] Brand testified that she wrote in "Centennial Arts

---

[1]   ECF 29, at 18–25. For the purposes of this Order, all citations to the Boosterthon Contract are to the version attached to the Second Amended Complaint.

[2]   ECF 29.

[3]   *Id*. ¶ 8.

[4]   ECF 61 (Brand Dep. Tr. 17:3–5, 27:24–28:2); ECF 62 (Clayton Dep. Tr. 14:23–15:4, 27:6–9).

[5]   ECF 61 (Brand Dep. Tr. 27:24–28:9); ECF 62 (Clayton Dep. Tr. 26:5–10).

[6]   ECF 61 (Brand Dep. Tr. 25:5–7); ECF 62 (Clayton Dep. Tr. 15:23–16:11).

[7]   ECF 64-3, ¶ 5.

[8]   ECF 68 (Harley 30(b)(6) Dep. Tr. 54:2–8; 75:5–9).

Academy" as the "Client" in the Contract.[9] The listed contact for the "Client" —

Natalie Kempker — was not employed by the School or District, but served as the

PTA's fundraising chair.[10]

Pursuant to the Contract, Booster agreed to "conduct a Boosterthon Fun

Run" — an event "whereby students of educational institutions raise funds to

sponsor their participation in exercise based event[s]" at Centennial Arts

Academy.[11] Booster's responsibilities included, but were not limited to,

"supplying all prizes, advertising, promotion, organization, and refreshments

necessary or appropriate . . . to conduct a Boosterthon Fun Run."[12] The "Client"

agreed to "make available to Booster, its personnel and agents, any and all school

grounds and facilities" and "arrange for the volunteers."[13] The Contract also

required the "Client" to "determine the physical condition, health, and fitness of

its students and other participants," as well as "obtain legally enforceable liability

---

[9]   ECF 61 (Brand Dep. Tr. 25:3–4).

[10]   ECF 67 (Kempker Dep. Tr. 15:21–16:14; 46:9–15).

[11]   ECF 29, at 18.

[12]   *Id*. ¶ 2.

[13]   *Id*. ¶ 3.

waivers and releases from each and every participant, and attendee to, the Boosterthon Fun Run."[14] The Contract contained merger and indemnity clauses.[15]

The Boosterthon Fun Run was held inside the Centennial Arts Academy gymnasium on February 2, 2012.[16] During the event, Deborah Taylor—a staff member at Centennial Arts Academy—was injured.[17] On May 24, 2013, Taylor and her husband filed a lawsuit in the State Court of Fulton County, asserting a single negligence claim against Booster to recover damages for Taylor's injuries (the "Taylor Litigation").[18] Booster was contractually insured by Cincinnati Insurance Company ("Cincinnati") through a separate agreement.[19] On June 14, 2015, Cincinnati settled the Taylor Litigation on behalf of Booster for $6.9 million.[20]

On January 23, 2018, Cincinnati initiated this action against the District and PTA, seeking to recover the funds it expended to settle the Taylor Litigation.[21]

---

[14]  *Id*. at 20 ¶ 8.

[15]  *Id*. at 21 ¶ 10.

[16]  *Id*. at 26 (Ex. A: Boosterthon Fun Run Schedule).

[17]  *Id*. at 30–37; ECF 64, at 5.

[18]  ECF 29, at 30–37.

[19]  ECF 64-3, ¶ 33.

[20]  *Id*. ¶ 22.

[21]  ECF 1.

Cincinnati asserts four claims against the District: indemnification (Count I); breach of contract (Count II); contribution (Count III); and, punitive damages and attorney's fees (Count VI).[22] Cincinnati asserts those same four claims against the PTA, as well as two additional claims it styles as "alternative count[s]," for the violation of agency law (Count IV) and negligent misrepresentation (Count V).[23] On May 17, 2018, Cincinnati filed the operative Second Amended Complaint.[24] Jurisdiction is based on diversity of citizenship.

On March 4, 2019, the District and PTA both filed motions for summary judgment, seeking the dismissal of all counts against each defendant, respectively.[25] On March 25, 2019, Cincinnati responded to both motions.[26] On April 8, 2019, the District and PTA filed separate replies.[27]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[22]   *Id*.

[23]   *Id*.

[24]   ECF 29.

[25]   ECF 58; ECF 59.

[26]   ECF 64; ECF 65.

[27]   ECF 69; ECF 70.

Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   CHOICE OF LAW

"In diversity cases, the choice-of-law rules of the forum state determine what law governs." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013). "Pursuant to Georgia law, contractual choice-of-law provisions will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state." *Nat'l Freight, Inc. v. Consol. Container Co., LP*, 166 F. Supp. 3d 1320, 1326 (N.D. Ga. 2015) (*quoting CS–Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428 (2008)).

Paragraph 15 of the Boosterthon Contract states: "This Agreement will be construed and enforced according to the laws of the State of Georgia . . . without giving effect to any conflicts of law rule or principle that might require the application of the laws of another jurisdiction."[28] The parties do not dispute the applicability of Georgia law and neither has suggested that such an application would violate public policy or be prejudicial to the interests of any state.

---

[28]   ECF 29, at 23 ¶ 15.

Accordingly, the choice of law provision is valid and Georgia law applies to this dispute.

## IV.   THE DISTRICT'S MOTION FOR SUMMARY JUDGMENT

### a.   Cincinnati's Claims for Contribution and Indemnity Against the District Are Barred by Sovereign Immunity (Counts I and III).

"Sovereign immunity is a threshold issue that the trial court is required to address before reaching the merits of any other argument." *State Dep't of Corr. v. Developers Sur. & Indem. Co.*, 324 Ga. App. 371, 374 (2013) (internal punctuation omitted). Under the Georgia Constitution, "sovereign immunity extends to a county-wide school district." *Bomia v. Ben Hill Cty. Sch. Dist.*, 320 Ga. App. 423, 424 (2013) (*citing Coffee Cty. Sch. Dist. v. Snipes*, 216 Ga. App. 293, 294 (1995) ("Like the counties within which they are created, such school districts are political subdivisions of the state entitled to the sovereign immunity extended to the state."). *See also S.W. v. Clayton Cty. Pub. Sch.*, 185 F. Supp. 3d 1366, 1380 (N.D. Ga. 2016) ("A school district is a political subdivision of the State of Georgia and can avail itself of sovereign immunity."). The parties agree that the District "is

a charter school system" and "a political subdivision of the State of Georgia."[29] As

such, the District is protected by sovereign immunity.

A school district may, nonetheless, waive its sovereign immunity.

*See McDaniel v. Fulton Cty. Sch. Dist.*, 233 F. Supp. 2d 1364, 1387 (N.D. Ga. 2002)

("Sovereign immunity applies equally to public school districts in Georgia, unless

such immunity is waived."). Sovereign immunity can only be waived "by an Act

of the [Georgia] General Assembly which specifically provides that sovereign

immunity is thereby waived and the extent of the waiver." *Id.* (*citing Welborn v.*

*DeKalb Cty. Sch. Dist.*, 227 Ga. App. 377, 379 (1997)). *See also* GA. CONST.

ART. I, § 2, ¶ IX. A plaintiff seeking to prove the "waiver of sovereign immunity

bear[s] the burden of establishing the waiver." *Bowen v. Telfair Cty. Sch. Dist.*,

No. cv 618-112, 2019 WL 4463315, at *4 (S.D. Ga. Sept. 17, 2019) (*citing Bd. of Regents*

*of Univ. Sys. of Ga. v. Daniels*, 264 Ga. 328, 328 (1994)). *See also Georgia Dep't of Cmty.*

*Health v. Data Inquiry, LLC*, 313 Ga. App. 683, 685 (2012) ("It is axiomatic that the

party seeking to benefit from the waiver of sovereign immunity bears the burden

of proving such waiver.") (internal punctuation omitted).

---

[29]   ECF 29, ¶ 3; ECF 58, at 8 ¶ 5. *See also* ECF 65-1, ¶ 13 ("Gainesville City School
       District is a duly formed legal entity School Board existing under the authority
       of the law of the State of Georgia.").

For contribution and indemnity claims, the Georgia Supreme Court has held that the Georgia Torts Claim Act ("GTCA") "waives the State's sovereign immunity for such claims so long as the activity of the State that is alleged to make it a tortfeasor, and thus subject to a claim for contribution or indemnity, does not fall within one of the exceptions to the waiver of sovereign immunity." *Dep't of Transp. v. Montgomery Tank Lines, Inc.*, 276 Ga. 105, 105 (2003). However, school districts are expressly excluded from this provision. *McDaniel*, 233 F. Supp. 2d at 1387 ("The [GTCA] provides for a limited waiver of the state's sovereign immunity for the torts of its officials and employees, but the [GTCA] expressly excludes counties and school districts from the waiver.") (*citing* O.C.G.A. § 50-21-22) ("'State' . . . does not include counties, municipalities, school districts, other units of local government."). Thus, the GTCA does not waive the District's sovereign immunity.

Additionally, the Georgia Supreme Court has held that an indemnity clause in a municipal contract does not act as a waiver of sovereign immunity. *CSX Transp., Inc. v. City of Garden City*, 277 Ga. 248, 250 (2003). Instead, such an indemnity clause renders the agreement "void as an *ultra vires* contract." *Id*. Thus, the indemnity clause in the Boosterthon Contract cannot waive the District's sovereign immunity.

Cincinnati also points to O.C.G.A. § 36-33-1, which states:

> A municipal corporation shall not waive its immunity by
> the purchase of liability insurance . . . unless the policy of
> insurance issued covers an occurrence for which the
> defense of sovereign immunity is available, and then
> only to the extent of the limits of such insurance policy.

Cincinnati contends the District waived its sovereign immunity by purchasing an insurance policy that provided coverage for the allegations in Cincinnati's Complaint.[30]

Despite this contention, Cincinnati does not provide the Court with any evidence of such an insurance policy. Cincinnati instead speculates the District may have obtained insurance based on a statement made by the District's attorney during a deposition.[31] Without actual evidence of the policy, the Court cannot make an accurate assessment of its effect, if any, on the sovereign immunity waiver analysis. Cincinnati's conjecture is insufficient to overcome the District's entitlement to sovereign immunity, and therefore, summary judgment.

Even if Cincinnati had provided the Court with the purported insurance policy, it would not change the result. "O.C.G.A. § 36–33–1 by its terms applies to municipal corporations, not to counties." *Athens-Clarke Cty. v. Torres*, 246 Ga. App.

---

[30]   ECF 65, at 13.

[31]   *Id.*

215, 216 (2000). *See also Bowen*, 2019 WL 4463315, at *4. As in *Bowen*, Cincinnati is suing a county school district, not a municipal corporation. Thus, such an insurance policy would not waive the District's sovereign immunity. *See Collier v. Conway*, 672 F. App'x 950, 952–53 (11th Cir. 2016) ("The Georgia Supreme Court has distinguished counties from municipalities, finding that counties are subdivisions of the State government, while municipalities are creatures of the legislature, whose existence may be established, altered, amended, or utterly abolished by the legislature.") (*citing Troup Cty. Elec. Membership Corp. v. Ga. Power Co.*, 229 Ga. 348, 354 (1972)).

Therefore, the District is entitled to summary judgment on Cincinnati's claims for indemnity and contribution (Counts I and III).

### b. The District Is Entitled to Summary Judgment on Cincinnati's Breach of Contract Claim (Count II).

Cincinnati argues that, even if its contribution and indemnity claims are barred by sovereign immunity, its breach of contract claim is not because the District "was still required by the Contract to provide Booster with enforceable waivers of liability from all attendees to the Fun Run."[32]

---

[32]   ECF 65. *See also* ECF 29, ¶ 8.

Georgia law treats breach of contract claims differently than claims for contribution and indemnification for the purposes of sovereign immunity. The Georgia Constitution provides that "[t]he state's defense of sovereign immunity is hereby waived as to any action *ex contractu* for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies." GA. CONST. ART. I, § 2, ¶ IX. To overcome the District's sovereign immunity on its breach of contract claim, Cincinnati must show that "the contract sought to be enforced is in writing and contains all of the terms necessary to constitute a valid contract." *Data Inquiry*, 313 Ga. App. at 685.

The Georgia Supreme Court has made clear that:

> General rules of contract law that might otherwise support a claim for breach of contract damages between private parties, however, will not support a claim against the state or one of its agencies if the contract is not in writing so as to trigger the waiver of sovereign immunity. . . . general contract rules may not be applied to create a waiver of sovereign immunity where the contract is not in writing as required by the Constitution and by OCGA § 50–21–1. The doctrine of sovereign immunity requires that the conditions and limitations of the statute that waives immunity be strictly followed.

*Ga. Dep't of Labor v. RTT Assocs., Inc.*, 299 Ga. 78, 82 (2016). *See also City of Warrenton v. Johnson*, 235 Ga. 665, 666 (1975) ("Oral contracts on behalf of a county have repeatedly been held to be void."). As a relevant example, a party "may not

recover for breach of contract against the State based on . . . the parties' course of conduct even if a document exists supplying the material terms of the alleged contract." *Boyd v. Neal*, 350 Ga. App. 274, 277 (2019) (*citing RTT Assocs., Inc.*, 299 Ga. at 82–83).

Neither party disputes that the Boosterthon Contract purports to be a written agreement between, at a minimum, Booster and Centennial Arts Academy.[33] The critical inquiry is whether the District is bound by the Contract.

Georgia contract law states that "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. Since the "consent of the parties [is] essential to a contract, until each has assented to all the terms, there is no binding contract." O.C.G.A. § 13-3-2. Regarding assent, the "cardinal rule of contract construction is to ascertain the intention of the parties." *Bd. of Comm'rs of Crisp Cty. v. City Comm'rs of City of Cordele*, 315 Ga. App. 696, 699 (2012). Contract construction involves three steps:

> (1) Is the language clear and unambiguous? If it is, the court simply enforces the contract according to its terms. If it is ambiguous, (2) the court must apply the rules of

---

[33]   ECF 29, at 18.

> contract construction to resolve the ambiguity. If the ambiguity cannot be resolved, (3) the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Harris v. Distinctive Builders, Inc.*, 249 Ga. App. 686, 688 (2001).

As a general rule "a non-party to a contract cannot breach that contract." *Uhlig v. Drayprop, LLC*, No. 4:11-cv-145, 2013 WL 5532883, at *5 (S.D. Ga. Oct. 4, 2013) (*citing UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 592 (2013)). *See also Gondolier Pizza Int'l, Inc. v. CRT Too, LLC*, No. 1:08-cv-01986-JEC, 2009 WL 3152183, at *11 (N.D. Ga. Sept. 29, 2009) ("[T]he general rule is that one who does not sign a contract is not bound by the contract's terms."); *Kaesemeyer v. Angiogenix, Inc.*, 278 Ga. App. 434, 437 (2006) ("It is axiomatic that a person who is not a party to a contract is not bound by its terms."). However, while "non-signatories are generally not bound by contracts, traditional principles of state law may allow a contract to be enforced by or against nonparties to the contract." *Cajun Glob. LLC v. Swati Enters., Inc.*, 283 F. Supp. 3d 1325, 1330 (N.D. Ga. 2017).

The District argues it is entitled to summary judgment because there is no evidence that the District entered into the Boosterthon Contract and, thus, cannot be bound by its terms.[34] To be sure, the District is not listed as a named party or

---

[34]   ECF 58-3, at 6.

referenced in the Contract. Instead, Centennial Arts Academy's name and address are listed as the "Client."[35] The Court finds an issue of fact about the real counterparty (if any) to the Contract, as Cincinnati presents evidence that "Centennial Arts Academy" is not a legal entity and cannot execute its own contracts.[36] Moreover, Brand and Clayton signed the Contract, purportedly on behalf of "Centennial Arts Academy," as the "president" and "president pro-tem," respectively.[37] However, Brand and Clayton both testified that they were not employed by Centennial Arts Academy or the District.[38] Likewise, neither held officer roles in the School.[39] Brand testified that she was the individual who hand-wrote "Centennial Arts Academy" as the "Client" in the Contract.[40]

At bottom, there is no dispute of fact with regard to the District's role: it was not a party to the Contract. Brand and Clayton were not employed by or

---

[35]   ECF 29, at 23 ¶ 14.

[36]   ECF 61 (Brand Dep. Tr. 25: 18–22); ECF 68 (Harley 30(b)(6) Dep. Tr. 54:2–11).

[37]   ECF 29-1.

[38]   ECF 61 (Brand Dep. Tr. 17:3–5, 27:24–28:2); ECF 62 (Clayton Dep. Tr. 14:23–15:4, 27:6–9).

[39]   *Id.*

[40]   ECF 61 (Brand Dep. Tr. 25:3–4).

authorized to represent the District.[41] The same goes for Kempker.[42] None of these individuals had the authority to bind the District, as the superintendent is the only individual with authority to do so.[43] While Brand testified that Williams—Centennial Arts Academy's principal—authorized Brand and Clayton to sign the Contract,[44] this does not change the result. Apart from being a county employee, there is no indication Williams possessed any authority to bind the District. Indeed, while not dispositive, the affidavit submitted by Phillip Hartley (the District's 30(b)(6) representative) outlines the detailed process required for the District to approve a contract, none of which was observed here.[45]

Cincinnati argues that the Boosterthon Contract's omission of the District's name is a mere "misnomer, as the intent of Booster and the Defendants at the time of the execution of the Contract was to include Booster and the Defendants as parties."[46] In support, Cincinnati points to the affidavit of Brad Davis (Booster's

---

[41]  *Id*. 17:3–5, 27:24–28:2; ECF 62 (Clayton Dep. Tr. 15:2–4, 27:6–9).

[42]  ECF 67 (Kempker Dep. Tr. 15:21–16:14).

[43]  ECF 68 (Hartley 30(b)(6) Dep. Tr. 28:9–22). Harley also testified that "on some occasions, certain contracts would be executed by the president or chairman of the [District's] board, attested by the superintendent." *Id*. at 19:19–24.

[44]  ECF 61 (Brand Dep. Tr. 25:5–7).

[45]  ECF 58, at 8–11 (Hartley Aff.).

[46]  ECF 65, at 7.

former employee) and Kempker's testimony.[47] This evidence, however, does not create a genuine issue of material fact.

In his affidavit, Davis states that he negotiated the Boosterthon Contract on behalf of Booster and "communicated with representatives of . . . the Gainesville School District regarding negotiation and execution of the Contract."[48] Davis also states that he communicated with the District about the Contract after its execution.[49] Based on these communications, Davis states that he believed the Contract was to be executed between Booster and the District.[50]

Davis's affidavit, however, fails to create a dispute of fact. While the Eleventh Circuit has held that "nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving," it is clear that "[a]n affidavit cannot be conclusory." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018). *See also Flores v. Ultimate Appearance Law Serv., LLC*, No. 1:14-cv-485-RWS, 2016 WL 7437124, at *2 (N.D. Ga. Sept. 15, 2016) ("It is well settled that self-serving, conclusory affidavits submitted by a nonmoving party in

---

[47]   *Id*. at 9–10.

[48]   ECF 64-1, at 2.

[49]   *Id*.

[50]   *Id*.

opposition to a motion for summary judgment will not create an issue of fact for trial."). Here, Davis's affidavit falls squarely into this bucket, as he fails to articulate any specific facts—including such basics as names, dates, and information discussed—regarding his alleged negotiations with the "District." Beyond simply self-serving, Davis's affidavit relies on speculation and is conclusory in nature. This is insufficient to rebut the concrete record evidence.

Cincinnati's citation to Kempker's testimony fairs no better. Kempker stated she had no knowledge of the District's involvement with the Boosterthon Contract.[51] Moreover, Cincinnati's cited cases on the "misnomer" point miss the mark, as they concern either the misnaming of a corporate entity in a pleading or an agency relationship, neither of which are relevant to the District in this case.[52]

Finally, Cincinnati argues that, even if the District was not initially a party to the Boosterthon Contract, it ratified the Contract by permitting the Fun Run to go forward and allegedly retaining some of the money raised.[53] This argument ignores Georgia sovereign immunity law. *Boyd*, 350 Ga. App. at 277 (holding party "may not recover for breach of contract against the State based on . . . the parties'

---

[51]  ECF 67 (Kempker Dep. Tr. 26:23–27:21).

[52]  ECF 65, at 8–10.

[53]  *Id*. at 10.

course of conduct even if a document exists supplying the material terms of the alleged contract"). Even considering the merits of Cincinnati's argument, it fails to create an issue of fact. Cincinnati points to the deposition testimony of Phillip Hartley, who stated that while he had no actual knowledge of a specific District meeting regarding the Fun Run, and did not attend such a meeting even if one occurred, the Board could have approved the event within a group of other fundraisers at some unspecified time.[54] Hartley also testified that, based on his knowledge, the District had no specific knowledge of the Boosterthon Contract, and thus had not taken any steps to repudiate the Contract.[55]

Cincinnati's reliance on Harley's testimony is belied by his statement that he had no knowledge of the District approving or discussing the Boosterthon Contract.[56] What is more, Hartley had no knowledge of the District accepting any proceeds from the Fun Run.[57] It is true that Georgia law provides that "[a] school district or school board can ratify contracts that it had the power to authorize in advance, and a school system's acceptance of benefits under an unauthorized

---

[54]   ECF 68 (Hartley Dep. Tr. 25:6–27:17).

[55]   ECF 68 (Harley Dep. Tr. 66:6–10).

[56]   *Id*. 25:6–27:17.

[57]   *Id*.

contract constitutes evidence of ratification." *Xerox Corp. v. Long Cty. Bd. of Educ.*, No. CIV.A. CV205-175, 2006 WL 753196, at *6 (S.D. Ga. Mar. 21, 2006) (*citing Wilson v. Strange*, 235 Ga. 156, 160 (1975)). However, a school district or board "cannot ratify an agreement unless [it] knows all the material facts surrounding the transaction." *Xerox Corp.*, 2006 WL 753196, at * 7.

Cincinnati's argument fails because it cites no evidence that the District had knowledge of the material facts of the Boosterthon Contract and approved it. Moreover, as stated above, Cincinnati does not point to evidence showing that any of the individuals allegedly involved in the Contract—*i.e.*, Carneal, Davis, Williams, Brand, Clayton, or Kempker—were acting as the District's agents. Cincinnati only realleges that Williams authorized Brand and Clayton to execute the Contract.[58] In any event, there is no evidence that Williams acted as the District's agent. Even if she had, her personal knowledge of the Contract would be wholly insufficient to bind the District for the purposes of contract ratification. *GIW Indus., Inc. v. JerPeg Contracting, Inc.*, 530 F. Supp. 2d 1323, 1342 (S.D. Ga. 2008) ("[B]efore ratification will be found, it must be determined that the principal possessed full knowledge of all material facts relevant to the act ratified. . . . [A]

---

[58]   ECF 65, at 10.

principal is not put on notice of the unauthorized act of an agent by the mere knowledge of the agent of the acts he himself has done in excess of his authority.").

Therefore, the District is entitled to summary judgment on Cincinnati's breach of contract claim (Count II).

### c.     The District Is Entitled to Summary Judgment on Cincinnati's Claim for Punitive Damages and Attorney's Fees (Count VI).

"Under Georgia law, a plaintiff cannot recover punitive damages when the underlying tort claim fails." *Lewis v. Meredith Corp.*, 293 Ga. App. 747, 750 (2008). Similarly, a claim for attorney's fees under O.C.G.A. § 13-6-11 "requires an underlying claim" and cannot "lie independently of the tort causes of action foreclosed by the summary judgment order." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1316 (11th Cir. 2004) (*citing United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 147 (1996)). Since the District is entitled to summary judgment on all of Cincinnati's substantive claims, the claim for punitive damages and attorney's fees (Count VI) must be dismissed.

## V.     THE PTA'S MOTION FOR SUMMARY JUDGMENT

The PTA asserts it is entitled to summary judgment because (1) Cincinnati cannot recover for voluntary settlement payments it made to Taylor; and

(2) Cincinnati cannot establish every element of its asserted claims.[59] The Court addresses each basis below.

### a.   Cincinnati's Claims Are Not Barred by the Voluntary Payment Doctrine.[60]

The PTA argues all of Cincinnati's claims are barred because the $6.9 million payment it made to settle the Taylor Litigation was a voluntary payment that cannot be recovered under Georgia law. O.C.G.A. § 13-1-13 provides:

> Payments of claims made through ignorance of the law or where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property.

As the "party seeking to recover payment," Cincinnati "bears the burden of showing that the voluntary payment doctrine does not apply." *Progressive Elec. Servs., Inc. v. Task Force Const., Inc.*, 327 Ga. App. 608, 618 (2014).

---

[59]   ECF 59-2, at 11, 13.

[60]   The Court notes that, while the District made a virtually identical argument regarding the voluntary payment doctrine in its motion for summary judgment, it was unnecessary to reach the merits of that argument since the District's motion is granted on other grounds.

Cincinnati does not dispute that it paid $6.9 million to settle the Taylor Litigation on behalf of Booster. Cincinnati argues this payment was not voluntary, but made "due to a legal necessity," as Cincinnati was legally obligated to indemnify Booster pursuant to a separate insurance agreement.[61]

The Court agrees. This Court has held that "a payment that is made pursuant to a legal obligation or is legally necessary—*i.e.* one that is not made under either ignorance of law or misplaced confidence, deceit or fraud—is not voluntary." *Wells Fargo Bank, N.A. v. Airport Mini Mall, LLC*, No. 1:17-cv-04249-AT, 2019 WL 7496256, at *6 (N.D. Ga. Sept. 30, 2019) (*citing Progressive Elec. Servs.*, 327 Ga. App. at 618). *Cf. Emergency Prof'ls of Atl., P.C. v. Watson*, 288 Ga. App. 473, 475 (2007) ("[N]o indemnity claim exists where the party seeking indemnity was not legally obligated to make the payment.").

Based on the record, Cincinnati has demonstrated that its payment was not voluntary because it was contractually obligated to indemnify Booster in the Taylor Litigation. The PTA points to no evidence that the settlement amount was an otherwise voluntary payment made due to the ignorance of law, misplaced confidence, deceit, or fraud. Instead, the PTA argues Cincinnati's payment was

---

[61]   ECF 64 (Swiat Aff.), at 7–10, Ex. B.

voluntary simply because no pending judgment or court order forced it to make the payment.[62] While this may be true, Georgia law does not stand for the proposition that, notwithstanding the presence of a contractual indemnity clause, there must be a pending court order or judgment or else a settlement payment will be considered voluntary. The PTA does not point the Court to any case embracing such a holding. Indeed, such a rule would undermine the favorable judicial policy of encouraging the amicable resolution of litigation. *See, e.g., In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000) ("[T]he court should be mindful of the judicial policy favoring settlement and cognizant that compromise is the essence of settlement. Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored by the law.") (internal citations omitted). The PTA's rule would also undermine the purpose of contractual indemnity clauses. Thus, O.C.G.A. § 13-1-13 does not bar Cincinnati's claims against the PTA.

---

[62]   ECF 64-3, ¶ 24.

**b.   Cincinnati's Individual Causes of Action**

**i.   Genuine Issues of Fact Exist as to Whether the PTA was a Party to the Boosterthon Contract.**

Like the District, the PTA seeks summary judgment on Count I (indemnity) and Count II (breach of contract) because it is not a named party to the Boosterthon Contract.[63] As stated above, while the general rule in Georgia is that "one who does not sign a contract is not bound by the contract's terms," the Boosterthon Contract is ambiguous as to the contracting parties. In contrast to the clear evidence that the District was not a party to the Contract, Cincinnati and the PTA present conflicting views of whether the PTA was a party to the Contract. The record reflects issues of fact regarding whether (1) the PTA was bound to the Contract by the actions of its agents, and (2) whether the PTA assented to the terms of the Contract through its conduct. Because these ambiguities are material, they must be determined by a jury.

For the "acts of an agent [to] be binding on his alleged principal, a principal and agent relationship must be proved and it must be established that the agent acted within the scope of his authority." *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1337 (N.D. Ga. 2008) (*citing Anaya v. Coello*, 279 Ga. App. 578, 580 (2006)). An

---

[63]   ECF 59-2, at 13–17.

agency relationship may arise "expressly, by implication, or through subsequent ratification by the principal of the agent's conduct." *Id.* (*citing* O.C.G.A. § 10–6–1). An agency relationship may also "be proved by circumstantial evidence." *Hinely v. Barrow*, 169 Ga. App. 529, 530 (1984) (*citing* O.C.G.A. § 10-6-1). Express agency exists when "the principal expressly confers authority on the agent to act on its behalf." *D.M.I. Dynamic Mgmt. & Invs., B.V. v. Konvict Muzik, LLC*, No. 1:10-cv-3510-TWT, 2011 WL 2119131, at *2 (N.D. Ga. May 26, 2011). Implied agency arises "due to the apparent authority of an agent, even if the agent has no actual authority, but only due to the conduct of the principal vis-a-vis the third-party." *J'Carpc*, 545 F. Supp. 2d at 1337 (*citing Hinely*, 169 Ga. App. at 530) ("Agency may result where one party has apparent authority to affect the legal relations of another party by transactions with a third party."). Finally, an agency relationship is created by ratification "when a principal subsequently ratifies the acts of another in his behalf." *J'Carpc*, 545 F. Supp. 2d at 1338 (*citing Ellis v. Fuller*, 282 Ga. App. 307, 309 (2006)).

Here, there are material issues of fact as to whether Brand, Clayton, and Kempker were acting as the PTA's agents, and if they were, whether they bound the PTA to the Boosterthon Contract. For instance, Cincinnati presents evidence that "Centennial Arts Academy" is not a legal entity and it cannot execute its own

contracts.[64] Nonetheless, Clayton and Brand signed the Contract as the "president" and "president pro-tem," respectively.[65] Brand testified that, as president of the PTA, she knew she had the ability to sign contracts on behalf of the PTA without requesting or receiving permission from anyone else.[66] In fact, it is Brand who wrote "Centennial Arts Academy" as the "Client" in the Boosterthon Contract.[67]

Bland and Clayton also testified that they were instructed to sign the Boosterthon Contract by Charlene Williams on an expedited basis.[68] Williams attended and participated in all the PTA's meetings and generally approved all the PTA's events. Clayton testified that the Fun Run would not have gone forward without Williams's approval.[69] Kempker, who is listed as the contact for the "Client," was also a member of the PTA when the Boosterthon Contract was executed.[70] As the PTA's fundraising chair, Kempker was in charge of

---

[64]   ECF 61 (Brand Dep. Tr. 25: 18–22); ECF 68 (Harley 30(b)(6) Dep. Tr. 54:2–11).

[65]   ECF 29, at 25; ECF 61 (Brand Dep. Tr. 26:18–28:21).

[66]   ECF 61 (Brand Dep. Tr. 26:18–27:5; 39:15–18).

[67]   *Id.* 25:3–4.

[68]   *Id*. 25:5–7; ECF 62 (Clayton Dep. Tr. 15:23–16:11; 47:23–25).

[69]   ECF 62 (Clayton Dep. Tr. 22:19–25).

[70]   ECF 67 (Kempker Dep. Tr. 46:9–15).

organizing and executing the Booster Fun Run.[71] This evidence raises several factual issues regarding agency principles that cannot be adjudicated by the Court as a matter of law.

Additionally, there are factual issues regarding whether the PTA assented to the Boosterthon Contract after its execution. To be sure, while "agreements to agree or preliminary statements of intent to contract in the future are unenforceable," such agreements "may become enforceable due to the subsequent actions of the parties." *Fed. Paper Bd. Co. v. Harbert-Yeargin, Inc.*, 92 F. Supp. 2d 1342, 1349–50 (N.D. Ga. 1998) (applying Georgia law). A party's "performance of the terms of a contract can be evidence of the acceptance of the terms of the contract." *Id*. Importantly, assent to a contract "may be given other than by signatures . . . [and] acceptance is inferred from a performance under the contract, in part or in full, and [the party] becomes bound." *Burson v. Milton Hall Surgical Assocs., LLC*, 343 Ga. App. 159, 167 (2017).

The record indicates that the PTA was intricately involved in the planning and execution of the Fun Run.[72] In fact, the only dealings the PTA had with Booster

---

[71]   ECF 61 (Brand Dep. Tr. 33:7–9).

[72]   *Id*. 37:17–38:1; ECF 67 (Kempker Dep. Tr. 51:18–23).

dealt with the Boosterthon Fun Run.[73] Kempker testified that Brand, as the president of the PTA, initially contacted Booster to plan the Fun Run.[74] Kempker, Brand, and Williams all subsequently communicated with Booster—through Brad Davis and other liaisons—to set up the event.[75] The record also indicates that the PTA is the entity that actually performed the actions required of the "Client" in the Boosterthon Contract. For example, the PTA: (1) paid Booster the required $2,000 "booking fee";[76] (2) provided the required volunteers to assist with the event;[77] and (3) collected the proceeds from the Fun Run, paid Booster $15,540.19 after the event for its services, and kept the remainder.[78] The check paying Booster was issued from the PTA's account and was signed by Clayton and Blair Hickerson, then-treasurer of the PTA.[79] What is more, in a separate, but substantially identical, contract executed on April 26, 2013 concerning a

---

[73]   ECF 67 (Kempker Dep. Tr. 39:1–12).

[74]   *Id.* 21:14–18.

[75]   *Id.* 22:16–23:23.

[76]   ECF 61 (Brand Dep. Tr. 29:19–24).

[77]   *Id.* 29:25–30:7.

[78]   *Id.* 30:9–19.

[79]   ECF 62 (Clayton Dep. Tr. 32:5–33:3); ECF 63-1 (Holcombe Dep. Ex. 3).

subsequent Fun Run that was later cancelled, the "Client" is listed as "Centennial Arts Academy, *a PTA*."[80]

Based on the record evidence, there is a genuine issue of material fact as to whether the PTA was a party to, assented to, or was bound by, the Boosterthon Contract. As such, the PTA is not entitled to summary judgment on Count I or Count II.

### ii.   The PTA Is Not Entitled to Summary Judgment on Cincinnati's Contribution Claim (Count III).

The PTA requests summary judgment on Cincinnati's contribution claim because Cincinnati "has presented no admissible evidence indicating that the PTA controlled the Boosterthon Fun Run at issue . . . or was in any way liable outside of alleged breach of contract claims."[81] Since there are genuine issues of material fact as to whether the PTA was a party to the Boosterthon Contract, Cincinnati's contribution claim is still viable. Moreover, the parties have presented conflicting testimony as to the level of the PTA's involvement with the execution and implementation of the Fun Run, as discussed above. In light of these disputed factual issues, the PTA is not entitled to summary judgment on Count III.

---

[80]   ECF 67 (Kempker Dep. Ex. 14) (emphasis added).

[81]   ECF 59-2, at 20.

### iii.   The PTA Is Entitled to Summary Judgment on Cincinnati's Claim for Violation of Agency Law (Count IV).

As an "alternative count," Cincinnati alleges that the PTA "held themselves out to be the agents of the School when, in fact, they possessed no agency authority."[82] The PTA argues it is entitled to summary judgment because Cincinnati "has provided no admissible evidence indicating that [Brand, Clayton, or Kempker] were acting as agents of the PTA when they signed the Agreement," and "has provided no admissible evidence that the PTA was acting as an agent for any of the parties identified in the [Boosterthon Contract]."[83]

Irrespective of the parties' arguments and evidence presented, Count IV must be dismissed because the "violation of agency law" is not an independent cause of action. *Barabe v. Apax Partners Europe Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009) ("We conclude that the district court's orders state a proper basis for dismissing each claim. As the district court recognized . . . Count III (Agency Relationship) do[es] not plead independent causes of action."); *Brenner v. Future Graphics, LLC*, No. CIVA 1:06-cv-0362-CAP, 2006 WL 6306540, at *3 (N.D. Ga. Nov. 14, 2006) (dismissing separate claim brought under "theories of

---

[82]   ECF 29, ¶ 40.

[83]   ECF 59-2, at 17–18.

agency" because it is not independent cause of action). This claim merely represents factual allegations that support Cincinnati's other causes of action. *Chemence Med. Prod., Inc. v. Quinn*, No. 1:11-cv-1366-CAP, 2015 WL 12532179, at *18 n.13 (N.D. Ga. Aug. 5, 2015) ("[A]gency-principal is not an independent cause of action; it is a theory under which [Defendant] seeks to impose liability on [Plaintiff]" through its counterclaims).

Thus, the PTA is entitled to summary judgment on Count IV.

### iv. The PTA Is Entitled to Summary Judgment on Cincinnati's Claim for Negligent Misrepresentation (Count V).

As a second "alternative count," Cincinnati contends the PTA "lacked the authority to bind the School and execute the Contract" but "negligently represented to Booster that it held authority to negotiate and sign the Contract as the School's agent."[84] In Georgia, the "essential elements of negligent misrepresentation are (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *Marquis Towers, Inc. v. Highland Grp.*, 265 Ga. App. 343, 346 (2004)

---

[84]   ECF 29, ¶¶ 51–52.

(*citing Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426 (1997)).

While there is conflicting factual evidence regarding whether Brand, Clayton, and Kempker acted as the PTA's agents, the PTA is nonetheless entitled to summary judgment on Count V because Cincinnati fails to present any evidence showing that anyone at Booster relied on any false information. In support of their motion for summary judgment, the PTA points to Holcombe's deposition testimony. Holcombe stated that he had no knowledge of either Brand's or Clayton's positions, authority to sign the Contract, or who Booster intended to contract with in executing the Boosterthon Contract.[85] The only evidence Cincinnati cites in rebuttal is Davis's affidavit, which as stated above, relies wholly on speculation and does not create a genuine issue of material fact.

Since Cincinnati has failed to present evidence that an individual at Booster relied on any false representation by any member of the PTA, the PTA is entitled to summary judgment on Count V.

  *v.* **The PTA Is Entitled to Summary Judgment on Count VI (Punitive Damages).**

According to O.C.G.A. § 51-12-5.1(b):

---

[85] ECF 63 (Holcombe Dep. Tr. 9:3–6; 26:18–28:18; 57:7–10).

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

Georgia law is clear that "punitive damages are not available in breach of contract claims." *ServiceMaster Co., L.P. v. Martin*, 252 Ga. App. 751, 757 (2001). *See also* O.C.G.A. § 13-6-10 ("Unless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts."); *Hester Enters., Inc. v. Narvais*, 198 Ga. App. 580, 582 (1991) ("[P]unitive damages are not recoverable for breach of contract, even though the breach may be in bad faith.").

As stated above, the PTA is entitled to summary judgment on all of Cincinnati's tort claims (Counts IV and V). The remainder of Cincinnati's claims are premised on its breach of contract cause of action. Since punitive damages are not recoverable for a breach of contract claim, the PTA is entitled to summary judgment on Count VI.

### vi. The PTA Is Not Entitled to Summary Judgment on Cincinnati's Claim for Attorney's Fees.

As discussed above, Cincinnati has viable claims against the PTA that cannot be resolved by this Court on summary judgment. The Georgia Supreme Court has held that "because both the liability for and amount of attorney fees

pursuant to OCGA § 13–6–11 are solely for the jury's determination, a trial court is not authorized to grant summary judgment in favor of a claimant therefor." *Covington Square Assocs., LLC v. Ingles Markets, Inc.*, 287 Ga. 445, 446 (2010). Since some of Cincinnati's claims against the PTA survive summary judgment, it is for the jury, not the Court, to determine whether attorneys' fees are warranted. Thus, the PTA is not entitled to summary judgment on Cincinnati's claim for attorney's fees.

## VI.    CONCLUSION

The District's motion for summary judgment [ECF 58] is **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of the District. The PTA's motion for summary judgment [ECF 59] is **GRANTED IN PART and DENIED IN PART**. Cincinnati shall be permitted to proceed to trial on Counts I, II, and III solely against the PTA. Within 45 days after the entry of this Order, Cincinnati and the PTA shall file a proposed consolidated pretrial order.

**SO ORDERED** this the 23rd day of March 2020.

Steven D. Grimberg
United States District Court Judge